

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| IN THE MATTER OF THE APPLICATION FOR SEARCH WARRANTS, AND THE AUTHORIZATION FOR ARREST WARRANTS AND ISSUANCE OF CRIMINAL COMPLAINTS | Case No. 3:21MJ___ <br><br> **Filed Under Seal** |

## AFFIDAVIT

I, Dennis DeMatteo, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AFFIANT BACKGROUND

1.     I am a sworn member of the Hartford Police Department and currently assigned to

the Major Crimes Division. I have approximately 13 years of police training and experience while

working as a Detective. I am currently tasked with the investigations of homicides, serious assaults

and untimely deaths. I have also been duly deputized as a Special Deputy United States Marshal

and am currently assigned to the Federal Bureau of Investigation (FBI) as a Task Force Officer.

As a law enforcement officer of the United States within the meaning of Title 18, United States

Code, Section 3061, I am empowered by federal law to conduct investigations and to make arrests

for offenses enumerated in Titles 18 and 21 of the United States Code, and other federal offenses.

2.     This Affidavit is first submitted in support of criminal complaints and arrest

warrants for the following individuals:

a.   Brandon BATISTE, a.k.a. "B," with a date of birth of xx-xx-1987; and

b.   Calvin ROBERSON, a.k.a. "Cutty," with a date of birth xx-xx-1982,

charging them with kidnapping resulting in death, in violation of Title 18, United States Code,

Sections 1201(a)(1) and 2, conspiracy to commit kidnaping, in violation of Title 18, United States

Code, Section 1201(c), and causing the death of Francisco Roman, Jr. through the use of a firearm,

1

in violation of Title 18, United States Code, Sections 924(j) and 2; and charging BATISTE with the use of fire or explosives in commission of a federal felony, in violation of Title 18, United States Code, Section 844(h)(1) (collectively the "Target Offenses").

3.    This affidavit is also submitted in support of applications for search warrants for the following devices and locations:

   a.  19 Poplar Place, Third Floor, Waterbury, Connecticut ("**Target Premises 1**"), which is located in the District of Connecticut;

   b.  Community Self-Storage, Unit A27, 22 Industrial Drive, South Hadley, Massachusetts ("**Target Premises 2**"), which is located in the District of Massachusetts;

   c.  Community Self-Storage, Unit A28, 22 Industrial Drive, South Hadley, Massachusetts ("**Target Premises 3**"), which is located in the District of Massachusetts;

   d.  Cellular Device, assigned call number (413) 519-4989, which is serviced by Verizon ("**Target Device 1**"), and is believed to be located in the District of Massachusetts;

   e.  Cellular Device, assigned call number (413) 356-0442, which is serviced by T-Mobile ("**Target Device 2**"), and is believed to be located in the District of Massachusetts;

   f.  Cellular Device, assigned call number (203) 297-4727, which is serviced by Sprint ("**Target Device 3**"), and is believed to be located in the District of Connecticut;

   g.  Cellular Device, assigned call number (413) 379-2014, which is serviced by AT&T ("**Target Device 4**"), and is believed to be located in the District of Connecticut;

   h.  Cellular Device, assigned call number (413) 459-7922, which is serviced by T-Mobile ("**Target Device 5**"), and is believed to be located in the District of Massachusetts; and

   i.  Cellular Device, assigned call number (860) 281-3198, which is serviced by Sprint ("**Target Device 6**"), and is believed to be located in the District of Connecticut.

## Description of Target Premises and Target Devices

4.     **Target Premises 1** is the third-floor apartment of 19 Poplar Place, Waterbury Connecticut, which is a multi-family, three story dwelling with an apartment located on each floor. There are two front entrances to the structure, with the northern entry door labeled with the numerals "19" above the doorframe, which provides access to the second and third floor apartments. **Target Premises 1** is the current residence of Calvin ROBERSON and Shamari SMITH.

5.     **Target Premises 2** and **3** are storage units located at Community Self-Storage, 22 Industrial Drive, South Hadley, Massachusetts. Community Self-Storage is a secured gated facility that offers keypad access to storage units 24 hours per day, 7 days a week. There is only one gated entrance/exit with a keypad that requires an access code. Units A27 and A28 each have a blue steel roll up door and each are identified with letter/number "A27" and "A28" above their respective doors. They are adjacent to each other and a key is needed to access both units. Both units are rented under the name of Patrick Oliver, who also uses the name of Patrick Batiste, the father of Brandon BATISTE.

6.     **Target Device 1** is a cellular device assigned call number (413) 519-4989, which is believed to be an Apple iPhone XR also assigned IMEI number 352891112480617, subscribed to Miguelina RIVAS, and serviced by Verizon. Verizon is a wireless communications service provider headquartered at One Verizon Way, Basking Ridge, New Jersey 07290. As set forth herein, there is probable cause to believe **Target Device 1** is used by and is in possession of BATISTE, and that the **Target Device** constitutes and contains evidence of the Target Offenses and was used in the commission of the Target Offenses. There is also reason to believe the **Target Device** is located in the District of Massachusetts. More particularly, BATISTE is a long time

3

residence of Springfield, Massachusetts, his father resides in Springfield, BATISTE has associations with three women who live in the Springfield area where BATISTE is known to stay, and the area code of the **Target Device** is "413" corresponds to the western portion of the District of Massachusetts. Toll records obtained by administrative subpoena on January 13, 2021 indicate that the phone was still active as of January 12, 2021. Pursuant to Rule 41(b)(2), law enforcement may locate the **Target Device** outside the district provided the device is within the district when the warrant is issued.

7.     **Target Device 2** is a cellular device assigned call number (413) 356-0442, which is believed to be an Apple iPhone, subscribed to Brian LNU, and serviced by T-Mobile. T-Mobile is a wireless communications service provider that is headquartered at 6360 Sprint Parkway, Overland Park, Kansas 66251.[1] As set forth herein, there is probable cause to believe **Target Device 2** is used by and in possession of BATISTE, and that the **Target Device** constitutes and contains evidence of the Target Offenses and was used in the commission of the Target Offenses. As described in the preceding paragraph, there is also reason to believe **Target Device 2** is located in the District of Massachusetts. Toll records obtained by administrative subpoena on January 29, 2021 indicate that the phone was still active as of January 28, 2021.

8.     **Target Device 3** is a cellular device assigned call number (203) 297-4727, which is believed to be an Apple iPhone also assigned IMSI number 310120167036614, and ESN 089551463300595526, with an unknown subscriber, and serviced by Sprint. Sprint is a wireless communications service provider headquartered at 6360 Sprint Parkway, Overland Park, Kansas

---

[1] T-Mobile and Sprint merged in 2020 and according to T-Mobile/Sprint legal compliance, requests for information should be directed to T-Mobile/Sprint, Legal & Emergency Response, 6360 Sprint Parkway, Overland Park, KS 66251.

66251. As set forth herein, there is probable cause to believe **Target Device 3** is used by and in possession of ROBERSON, and that the **Target Device** constitutes and contains evidence of the Target Offenses and was used in the commission of the Target Offenses. There is also reason to believe the **Target Device** is located in the District of Connecticut. ROBERSON is a known associate of BATISTE who has long standing ties to the Springfield, Massachusetts area, but ROBERSON and **Target Device 3** are believed to be currently located in the District of Connecticut. As discussed later in this affidavit, ROBERSON has a pending criminal case in Hampden County Massachusetts where he had been released on $5000 bail. ROBERSON was required to provide information to Massachusetts State Probation with a residential address and contact information including a phone number. ROBERSON is also required to check in with Probation while he awaits trial. ROBERSON last checked in with Probation on January 26, 2021, and the information he provided was that he was residing at **Target Premises 1** (19 Poplar Place, Third Floor, Waterbury, CT) ROBERSON provided Probation three contact numbers including **Target Devices 3** and **6** (Shamari SMITH). The area code "203" also corresponds with the District of Connecticut, particularly the western and southern part of Connecticut. Toll records obtained by administrative subpoena on January 29, 2021 indicate that the phone was still active as of January 28, 2021.

9.      **Target Device 4** is a cellular device assigned call number (413) 379-2014, which is believed to be an Apple iPhone XR also assigned IMEI 356440100450202, with an unknown subscriber, and serviced by AT&T. AT&T is a wireless communications service provider headquartered at 11760 U.S. Highway 1, Suite 600, North Palm Beach, Florida 33408. As set forth herein, there is probable cause to believe **Target Device 4** is used by and in possession of ROBERSON, and that the **Target Device** constitutes and contains evidence of the Target Offenses

5

and was used in the commission of the Target Offenses. As described in the preceding paragraph, there is also reason to believe **Target Device 4** is located in the District of Connecticut based on ROBERSON's current residence in Connecticut even though the area code "413" corresponds with the District of Massachusetts. Toll records obtained by administrative subpoena on January 29, 2021 indicate that the phone was still active as of January 28, 2021.

10.     **Target Device 5** is a cellular device assigned call number (413) 459-7922, which is believed to be an Apple iPhone, subscribed to Natasha MERCEDES and serviced by T-Mobile. T-Mobile is a wireless communications service provider headquartered at 6360 Sprint Parkway, Overland Park, Kansas 66251. As set forth herein, there is probable cause to believe **Target Device 5** is used by and in possession of Natasha GARCIA, a.k.a. "T," and that the **Target Device** constitutes and contains evidence of the Target Offenses and was used in the commission of the Target Offenses. There is reason to believe **Target Device 5** is located in the District of Massachusetts. GARCIA is known to reside in Chicopee, MA, she drives a vehicle which is registered in Massachusetts, and that area code of the **Target Device** corresponds to western Massachusetts. Toll records obtained by administrative subpoena on January 29, 2021 indicate that the phone was still active as of January 28, 2021.

11.     **Target Device 6** is a cellular device assigned call number (860) 281-3198, which is believed to be an Apple iPhone 11 also assigned IMSI number 312530011286008, ESN 356547102352309, and IMEI number 356547102352309, subscribed to Shamari SMITH of 19 Poplar Place, 3rd Floor Waterbury, CT. **Target Device 6** serviced by Sprint. Sprint is a wireless communications service provider headquartered at 6360 Sprint Parkway, Overland Park, Kansas 66251. As set forth herein, there is probable cause to believe **Target Device 6** is used by and in possession of Shamari SMITH, and that the **Target Device** constitutes and contains evidence of

6

the Target Offenses and was used in the commission of the Target Offenses. There is reason to believe **Target Device 6** is located in the District of Connecticut. As described in more detail herein, SMITH is known to reside in Waterbury, Connecticut at **Target Premises 1** and subscriber information for **Target Device 6** revealed that SMITH had previously resided at other addresses in Connecticut, including Manchester, Connecticut. Area code "860" corresponds to the District of Connecticut, particularly the eastern part of Connecticut. Toll records obtained by administrative subpoena on January 29, 2021 indicate that the phone was still active as of January 28, 2021.

12.     Verizon, AT&T, T-Mobile, and Sprint are all wireless communications service providers (collectively the "Service Provider"). As a provider of wireless communications service, the Service Provider is a provider of an electronic communications service, as defined in 18 U.S.C. § 2510(15).

### E-911 Precision Location Data for the Target Devices

13.     I also make this affidavit in support of an application for search warrants for information associated with **Target Devices 1** through **6**. The information to be searched is described in the following paragraphs and in Attachment A to the **Target Device** search warrants. This affidavit is made in support of applications for search warrants under 18 U.S.C. § 2703(c)(1)(A) and Federal Rule of Criminal Procedure 41 to require the Service Provider to disclose to the government the information further described in Section I of Attachment B to the **Target Device** search warrants. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review the information to locate items described in Section II of Attachment B to the **Target Device** search warrants.

7

14.     Because I am also seeking the prospective collection of information, including cell-site location information, that may fall within the statutory definitions of information collected by a "pen register" and/or "trap and trace device," *see* 18 U.S.C. § 3127(3) & (4), I also make this affidavit in support of an application by the United States of America for an order pursuant to 18 U.S.C §§ 3122 and 3123, authorizing the installation and use of pen registers and trap and trace devices (pen-trap devices) to record, decode, and/or capture dialing, routing, addressing, and signaling information associated with each communication to or from the **Target Devices**.

### Use of a Cell-Site Simulator for the Target Devices

15.     I also make this affidavit in support of a search warrant under Federal Rule of Criminal Procedure 41 to authorize law enforcement to employ an electronic investigative technique, which is described in Attachment B to the Cell Site Simulator Search Warrants, to determine the location of the **Target Devices** identified herein, which is described in Attachment A to the Cell Site Simulator Search Warrants.

16.     Because collecting the information authorized by this warrant may fall within the statutory definitions of a "pen register" or a "trap and trace device," *see* 18 U.S.C. § 3127(3) & (4), this warrant is designed to comply with the Pen Register Statute as well as Rule 41. *See* 18 U.S.C. §§ 3121-3127. This warrant therefore includes all the information required to be included in a pen register order. *See* 18 U.S.C. § 3123(b)(1).

17.     Thus, in summary, as it pertains to the **Target Devices**, the affidavit is submitted in support of three search warrants for each **Target Device**: a) to search the device itself (hereafter the "Target Device Search Warrants"); b) to obtain E-911 precision location information from the respective Service Provider (hereafter the "Target Device Precision Location Search Warrant");

and c) to utilize a cell-site simulator to assist in the location of the **Target Devices** (hereafter the "Target Device Cell-Site Simulator Search Warrant")

18.    Based on the facts set forth in this affidavit, there is probable cause to believe that: a) **Target Devices 1** through **6** contain and constitute evidence of, and were used in the commission of, the Target Offenses, for which the Court has authorized search warrants of the **Target Devices,** and that the requested precision location information and utilization of a cell-site simulator will assist in the location of the **Target Devices**; and b) BATISTE and ROBERSON are alleged to have committed one or more of the Target Offenses for which the Court has authorized arrest warrants and there is probable cause to believe that the location of **Target Devices 1** through **4** will assist law enforcement in locating and arresting BATISTE and ROBERSON, who are both a "person to be arrested" within the meaning of Federal Rule of Criminal Procedure 41(c)(4).

19.    The Court has jurisdiction to issue the proposed Target Device Precision Location Search Warrants and the Target Device Cell-Site Simulator Search Warrants because it is a "court of competent jurisdiction" as defined in 18 U.S.C. § 2711. Specifically, the Court is a district court of the United States that has jurisdiction over the offense being investigated; *see* 18 U.S.C. § 2711(3)(A)(i).

20.    The facts in this affidavit come from my personal observations, my training and experience, my review of police reports, documents, surveillance video, and information obtained from other law enforcement officers. This affidavit is intended to show merely that there is probable cause for the requested warrants and does not set forth all my knowledge about this investigation.

21.    Based on the facts set forth in this affidavit, there is probable cause to believe that BATISTE and ROBERSON committed the Target Offenses. There is also probable cause to

search the **Target Premises** and the **Target Devices** for evidence, instrumentalities, contraband, or fruits of the Target Offenses. There is also probable cause to search the information described in Attachment A and B to the Target Device Precision Location Search Warrants to enable investigators to locate the **Target Devices** as well as BATISTE and ROBERSON so that the requested search warrants may be executed and the **Target Devices** searched as authorized by the Court, and to enable investigators to arrest BATISTE and ROBERSON. Finally, there is probable cause to utilize a cell-site simulator to locate the **Target Devices** so that they may be located and searched and to arrest BATISTE and ROBERSON for whom arrest warrants are also being sought.

## BACKGROUND OF INVESTIGATION AND PROBABLE CAUSE

### The Discovery of Francisco Roman, Jr.'s Body – Hartford, Connecticut

23.    On December 26, 2020, at approximately 2042 hours, Hartford Police Dispatch received simultaneous 911 calls reporting a vehicle that was on fire and parked in front of 114 Shultas Place along with a report of what sounded as a single gunshot in the same area.[2] Patrol Officers were dispatched to this location and, upon arrival, located a black 2010 Acura ZDX Tech parked along the curb line of 114 Shultas Place engulfed in flames. Hartford Fire Department personnel arrived on scene moments later and extinguished the fire.

24.    As fire department personnel extinguished the fire, they observed a male body in the rear hatch compartment. The body had been severely burned and determined to be deceased. Upon closer inspection, a spent shell casing was observed within the hatch compartment, several inches from the body. The decedent also had metal handcuffs bound on one of his wrists indicating that the decedent was taken against his will and placed within the rear of this vehicle.

---

[2] The "gunshot" sound was likely the sound of the vehicle's airbag exploding during the fire.

25. A subsequent search of the Acura revealed the following:

   a. Fired cartridge casing stamped "Hornady 380 Auto" in the trunk to the right of Roman's body;

   b. A bullet projectile under Roman's body;

   c. Fired cartridge casing stamped "Hornady 380 Auto" under Roman's body;

   d. Melted gas can from the center console, from which a liquid sample was recovered and sent to the State of Connecticut forensic lab;

   e. Melted lighter fluid container from the front passenger's side seat;

   f. Deformed bullet projectile from the front trunk's jack compartment; and

   g. Roman's Massachusetts driver's license from the front passenger's side floor.

26. A post-mortem examination of the body (later identified as Francisco Roman, Jr.) was conducted on December 28, 2020, by Dr. Hays from the State of Connecticut Office of the Chief Medical Examiner. During the examination, Dr. Hays observed gunshot wounds to Roman's torso, left shoulder and top of his head, with three projectiles recovered from Roman's body. The cause of death was determined to be gunshot wounds to Roman's head, torso, and extremity and the manner of death is homicide.

27. The 2010 Acura ZDX was secured, and Hartford Police Major Crimes Division personnel were notified to assume the investigation. The vehicle was registered in the Commonwealth of Massachusetts to Francisco Roman Jr., with a date of birth of xx-xx-1992.

28. An investigation was also conducted as to the cause and origin of the fire by the Hartford Police and the City of Hartford Fire Marshal. Responding Hartford fire personnel detected a strong odor of gasoline and a gas can in the vehicle. The Fire Marshal responded to the scene to investigate the cause and origin of the vehicle fire. The Fire Marshal determined that the cause of the fire was "intentional" and that "flammable liquid" contributed to the fire's ignition.

11

## Missing Person Investigation – Chicopee, Massachusetts

29.     On December 25, 2020, at approximately 1635 hours, Chicopee (MA) Police received a missing person complaint for a Francisco Roman, Jr. of 115 South Street, Apartment 10, Chicopee, MA. On December 25, 2020, Roman's father went to the apartment looking for Roman. The apartment was locked so Roman's father broke a window to gain entry. Once inside, Roman's father found the apartment in disarray with bleach poured throughout the apartment. Chicopee police officers responded to Roman's apartment and observed that bleach had been poured throughout the apartment. Additional officers responded to Roman's apartment and processed and photographed the location.

30.     Roman's apartment was equipped with a Ring Home Surveillance System. The surveillance video was retrieved and reviewed. The surveillance video captured Roman exit his apartment on December 24, 2020, at approximately 2209 hours. At approximately 2303 hours, surveillance video captured an unknown masked individual enter Roman's apartment, seek out the Ring camera and remove it from its mount, disabling the system. Responding law enforcement officers observed no evidence consistent with forced entry, indicating the individual accessed the apartment with a key.

### Emergency Precision Location Information from Roman's Phone

31.     Massachusetts State Police investigators reported that when Roman went missing, he was in possession of a cellular telephone and the phone was active from December 24, 2020 at approximately 2300 hours until December 25, 2020, at approximately 0505 hours. Massachusetts investigators submitted an exigent circumstances request to AT&T to obtain historical location information and cell site location information from the time when Roman was reported missing. GPS coordinates were plotted and the time-line placed Roman's cellular phone in Chicopee at the

time he was abducted, leaving Chicopee headed southbound on December 25, 2020, at around 0020 hours, and traveling into Hartford, Connecticut, on December 25, 2020, at approximately 0050 hours, as more particularly described below.

32.     Cell tower and precision location data obtained for Roman's cellular telephone ("Roman Phone Data") showed its movement around the city of Hartford from approximately 0050 hours until approximately 0124 hours, on December 25, 2020. The combination of cell tower and precision location data and video surveillance were used by investigators to verify the accuracy of location estimates and to determine more precise estimates.

33.

## City of Hartford C4 Video and Other Recordings – December 25, 2020

34.     Hartford Police Major Crimes Division personnel accessed the City of Hartford's cameras associated with the Capital City Command Center (C4) Division. Investigators were able to locate Roman's black Acura ZDX on Broad Street in the City of Hartford on December 25, 2020, at approximately 0053 hours. This is consistent with the GPS coordinates obtained by the Massachusetts State Police investigators for Roman's cell phone. The C4 cameras captured the black Acura being followed by a silver GMC Acadia and a blue Mitsubishi Lancer. According to Massachusetts investigators, at approximately 0021 hours, a vehicle matching the description of Roman's Acura and a silver SUV consistent with a GMC Acadia are captured on a Chicopee City camera at Center and Hampden Streets heading towards Route 391, Exit 2, which is an access route to Route 91 south.

35.     Hartford's C4 cameras recorded the black Acura, silver GMC Acadia, and blue Mitsubishi traveling on Washington Street before turning onto Lincoln Street, which is a one-way street traveling westbound, at approximately 0055 hours. All three vehicles travel outside the view of the C4 cameras where they remained out of view for approximately four minutes.

36.     From the C4 recordings, investigators observed the silver GMC Acadia's marker plate as Maryland 2DW7033. As the vehicles turned onto Lincoln Street, the black Acura ZDX had marker plates affixed to its front and back. After approximately four minutes, the silver GMC Acadia and the black Acura reappeared on the C4 cameras driving from Lincoln Street onto Broad Street. Broad Street is the next intersecting street when traveling westbound on Lincoln Street. At this time, the black Acura had both marker plates missing. The blue Mitsubishi Lancer was not observed on the C4 cameras departing Lincoln Street with the other two vehicles. The C4 cameras were unable to record constant visual surveillance of the vehicles as they traveled. At 0108 hours,

14

C4 cameras captured the silver GMC Acadia traveling northbound on Maple Avenue, away from the area of Shultas Place, and turning left onto Jefferson Street.[3] At approximately 0110 hours, C4 cameras captured the GMC Acadia pull into a gas station at 234 Washington Street. The silver GMC Acadia parked at a gas pump, where the front seat passenger exited the vehicle and entered the station. The GMC Acadia remained at the gas station until approximately 0120 hours.

37. On December 26, 2020, after the discovery of the burning black Acura, investigators obtained video surveillance recordings from a nearby residence.[4] A review of the recordings revealed that the black Acura arrived and parked in the area of 114 Shultas Place, Hartford, on December 25, 2020, at approximately 0103 hours. Where the black Acura stopped on Shultas Place was in partial view of this nearby surveillance camera. A review of the video recording revealed that the black Acura appeared to remain at that same location on Shultas Place until it was set on fire on December 26, 2020, at approximately 2039 hours. The directions of travel by the black Acura and silver GMC in the early morning hours of December 25 is consistent with the GPS coordinates from Roman's phone obtained by the Massachusetts State Police.

### Identification of BATISTE, the GMC Acadia and Target Device 1

38. The silver GMC Acadia, bearing Maryland marker plate 2DW7033, was determined to be a vehicle rented from Enterprise Rent-A-Car ("Enterprise"), in East Hartford, Connecticut. Enterprise confirmed the vehicle had been rented by Brandon BATISTE, with a date of birth xx-xx-1987, on December 4, 2020. The vehicle was rented under a 30-day contract but

---

[3] Prior affidavits read that the GMC Acadia arrived at the gas station at 0108 hours. In reviewing the various recordings, the GMC Acadia arrived at approximately 0110 hours.

[4] Prior affidavits read that the video surveillance was from a business, but it was obtained from a residence.

was returned on December 26, 2020. Upon return of the GMC Acadia, Brandon BATISTE immediately rented another vehicle. BATISTE provided Enterprise with cell phone number (413) 519-4989 (**Target Device 1**) in connection with the rental contract. Enterprise policy is to verify the photographic identification, specifically the driver's license, when renting a vehicle, and to list that renter's information on the rental contract. Review of the Enterprise business records obtained pursuant to legal process show that both the GMC Acadia and the Dodge Charger were rented by Brandon BATISTE.

Moreover, investigators analyzed call detail records for this telephone and the three most contacted numbers belonged to: a) his mother (Cheryl Chase); b) his father (Patrick Oliver a.k.a. Patrick Batiste); and c) a female who resides at 18 Spring Street, Apartment 1L, Chicopee, MA. BATISTE's Massachusetts driver's license lists his address as 18 Spring Street, Apartment 2L, Chicopee, MA.

39.     From security video recordings and records provided by Enterprise, investigations were able to determine that BATISTE arrived at Enterprise in East Hartford at approximately 1202 hours on December 26, 2020. Security recordings captured BATISTE arrive in the GMC Acadia and back into a parking spot across from the front entrance. BATISTE then appeared to clean out the GMC before entering the building. At approximately 12:24 p.m., BATISTE exited the building with an Enterprise employee where he picked up the replacement vehicle, a 2019 green Dodge Charger, bearing Ohio marker plate HVS4782.

### Emergency Precision Location Information from Roman's Phone – December 25, 2020

40.     Roman Phone Data indicated that after departing Hartford at approximately 0120 hours, on December 25, 2020, the device travelled on Interstate 84 ("I-84") westbound to the area

16

of Southington, Connecticut, at approximately 0140 hours, on December 25, 2020. At approximately 0238 hours, Roman's phone appeared to be moving northeast on or near I-84 and then north on or near I-91, arriving back in the Springfield area around 0313 hours, and near the Chicopee Center area at 0319 hours. The City of Chicopee camera at Center and Hampden Streets captured a silver SUV, consistent with a GMC Acadia, traveling into Chicopee from Route 391, exit 2, at approximately 0317 hours. From approximately 0449 to 0505 hours, Roman's phone appears to move in the general areas of Broadway Street in Chicopee Falls and Liberty Street by the Springfield plaza area of Springfield. At 0500 hours, a City video camera recorded the GMC Acadia on Broadway near Abby Memorial Drive, which is in the Springfield Plaza area, heading towards the area of Liberty Heights. At approximately 0505 hours, the Roman phone appeared to have been in the area of Liberty Heights in Springfield.

41.

42.

REDACTED

43.

44.

REDACTED

45.    As described herein, **Target Device 1** was the number BATISTE provided to Enterprise in connection with his rental of the GMC Acadia.

46.    ROBERSON has a pending criminal case in Hampden County, Massachusetts where he was released on a $5000 bail. On January 26, 2021, ROBERSON had a court status hearing and probation check in. According to the Massachusetts' Probation Office, ROBERSON provided them 19 Poplar Place, Waterbury, Connecticut as his residence and three phone numbers: a) (203) 297-4727 (**Target Device 3**), b) (860) 281-3198 (**Target Device 6**) (SMITH's phone), and c) (413) 285-0465.

47.    On January 8, 2021, United States Magistrate Judge Thomas O. Farrish authorized a search warrant for records and information associated with certain cellular towers operated by AT&T, Verizon, T-Mobile and Sprint. On January 12, 2021, AT&T complied with the search warrant. **Target Device 4** is serviced by AT&T. AT&T cell tower records revealed the following[5]:

---

[5] Only AT&T and Verizon cell tower records have been received thus far and therefore the analysis of all cell records has not been completed.

a. At some time from 0050 hours to 0100 hours on December 25, 2020, **Target Device 4** used data provided by an AT&T cell tower that provided service to Lincoln Street (Hartford), between Washington and Broad Streets;

b. At some time from 0100 to 0110 hours on December 25, 2020, **Target Device 4** initiated a call using an AT&T cell tower that provided service to 114 Shultas Place, Hartford, to **Target Device 3**, which is a phone serviced by T-Mobile;

48.     At some time from 0105 hours to 0125 hours on December 25, 2020, **Target Device 4** used data provided by an AT&T cell tower that provided service to 234 Washington Street, Hartford (the Mobil Gas station where the GMC Acadia is located from 0110 to 0120 hours on December 25. 2020.

49.     Investigators also obtained call detail records from **Target Devices 1** through **4**. A review of the call detail records show that these devices were in regular contact with each other at times relevant to the investigation. For example, on December 24, 2020, at approximately 2007 hours, **Target Device 4** (ROBERSON's phone) called **Target Device 2** (BATISTE's phone). Shortly thereafter, at approximately 2030 hours, **Target Device 2** called **Target Device 5** (GARCIA). At approximately 2044 hours, **Target Device 5** called **Target Device 2**. At approximately 2112 hours, **Target Device 5** called **Target Device 2**.

50.     At approximately 2207 hours, which the investigation has revealed is nearing the time of Roman's abduction, **Target Device 3** (ROBERSON's phone) began communicating with **Target Device 4** (ROBERSON's other phone). Thereafter, **Target Device 3** communicated with **Target Device 4** until approximately 0107 hours and during this time neither **Target Device 3** nor **Target Device 4** called or communicated with any other telephone. For example,

21

a) beginning at 2325 hours, on December 24, 2020, **Target Device 3** called **Target Device 4**, with the call lasting approximately 9:18 minutes. **Target Device 4** is utilizing a cell site in the area of Chicopee center.

b) beginning at 2357 hours, on December 24, 2020, **Target Device 3** again called **Target Device 4**, with the call lasting approximately 4:02 minutes. **Target Device 4** is utilizing a cell site in the area of Chicopee center.

c) beginning at 0017 hours, on December 25, 2020, **Target Device 4** called **Target Device 3**, with the call lasting approximately 4:00 minutes. **Target Device 4** is utilizing a cell site in the area of Chicopee center.

d) beginning at 0035 hours, on December 25, 2020, **Target Device 4** again called **Target Device 3**, with the call lasting approximately 20:14 minutes. **Target Device 4** utilized multiple cell sites during this call, with the first site a tower near I-91 in Enfield, Connecticut, and the last cell site a tower on Retreat Avenue, Hartford, Connecticut.

e) beginning at 0100 hours, on December 25, 2020, **Target Device 4** again called **Target Device 3**, with the call lasting approximately 6:28 minutes. **Target Device 4** utilized multiple cell sites during this call, with the first site a tower along Vernon Street, Hartford, Connecticut, and the last cell site a tower on Retreat Avenue, Hartford.

51.     The call detail records revealed that in the time immediately preceding the abduction and murder of Roman through the time when Roman was left dead or dying handcuffed in the rear of his Acura, the ROBERSON phones (**Target Devices 3 and 4**) were in communication with each other. It is highly unlikely that ROBERSON would be calling himself. It is therefore likely that someone was using one of ROBERSON's phone during this time. From the review of cell site and precision location data received and analyzed by investigators, and comparing those records to video surveillance described herein, it is evident that one perpetrator drove the GMC Acadia and one perpetrator drove Roman's Acura. Given the manner in which this crime was committed, the perpetrators would have been in communication with each other as they traveled to Hartford, coordinated the removal of the marker plates from Roman's vehicle on Lincoln Street, and arranged the abandonment of Roman's Acura on Shultas Place. For example, as described

above, beginning at 0035 hours, on December 25, 2020, **Target Device 4** had a 20-minute call with **Target Device 3**. This 20-minute call would have concluded at approximately 0055 hours, or when the Hartford C4 cameras recorded the GMC Acadia and Roman's Acura arrive on Lincoln Street, Hartford, and where the vehicles remained for approximately four minutes while the marker plates were removed from the Acura, as described earlier in this Affidavit.

52.     Moreover, video surveillance obtained from Hartford Hospital security cameras captured what appeared to be a dark color sedan turn onto Shultas Place at approximately 0102 hours. At approximately 0104 hours, the same video surveillance captured a person wearing dark clothing walk from Shultas Place to Maple Avenue where the person waited on or near the sidewalk. At approximately 0106 hours the video captured a SUV type vehicle arrive at the corner of Maple Avenue and Shultas Place where the person was last standing. The vehicle stopped and seconds later departed. The individual who was at the corner is no longer seen in the recording. Approximately one minute later, the GMC Acadia is captured on a C4 camera traveling north on Maple Avenue. As noted above, beginning at 0100 hours, **Target Device 4** had a 6 ½ minute call with **Target Device 3**. This 6:28 minute call would have concluded at approximately 0106 hours, or when the pedestrian is picked up at the corner of Shultas Place and Maple Avenue by a SUV that is recorded on Hartford C4 cameras traveling north on Maple Avenue at approximately 0107 hours.

53.     When the GMC Acadia arrived at the Mobil Mart it had now had a front seat passenger.

54.     **Target Telephones 3** and **4** are not in communication with **Target Telephones 1** and **2** until approximately 0226 hours on December 25, 2020 when **Target Device 4**

23

communicated with **Target Device 2**. Shortly thereafter, at approximately 0239 hours, **Target Device 3** communicated with **Target Device 1**. Following that call, at approximately 0307 hours, **Target Device 4** communicated with **Target Device 1**.

55.     As detailed below, it is about this time where the cell site and precision location data show **Target Device 1** and the Roman phone travel east on I-84 to I-91 and eventually return to Chicopee. Meanwhile, **Target Device 4** remained in Waterbury.

### Further Identification of ROBERSON

56.                                                                    ., as corroborated by information from Massachusetts State Probation, investigators viewed multiple images posted to the *Kevin Robert* Facebook Account, which was identified by '      as ROBERSON's account.

57.     One image, posted on December 8, 2020, showed a black male wearing a Billionaire Boys Club t-shirt with a gold necklace and a black hat. The male has a tattoo that reads "RIP" vertically on the lateral side of his forearm, and another tattoo that reads "CUTT" on the medial side of his forearm. The bottom part of the CUTT tattoo is not visible in the image. Another image, posted on August 10, 2020, showed a shirtless black male standing with a light skinned black female on a beach. The male in the photograph appeared to have a distinct, large vertical scar in the center of his abdomen.

58.     Calvin ROBERSON was booked into the Massachusetts Department of Corrections in 2008, and numerous photographs were taken of him and his tattoos. One booking photograph shows ROBERSON with a distinct, large vertical scar on his abdomen. Another DOC booking photograph shows Roberson with a tattoo on the interior of his left arm that includes a vertical "C U T T" and what appears to be part of a larger tattoo that may include the top of the letter "Y" at the bottom. ROBERSON's DOC records indicate that his nickname "Cutty,"

24

Another DOC booking photograph shows a vertical "RIP" on the lateral portion of ROBERSON's left forearm. ROBERSON's DOC documented scars and tattoos appear to match those on the individual depicted in the *Kevin Robert* Facebook page.

59.

60.

REDACTED

61.

62.     GARCIA's residence at 109 Grape Street, Chicopee is a short distance from Roman's residence at 115 South Street. Investigators have obtained and reviewed public and private video surveillance from numerous parts of Chicopee at times relevant to their investigation. According to video surveillance recordings, on December 24, 2020, at approximately 2214 hours, a GMC Acadia turned onto Grape Street from Springfield Street and then appeared to turn right (east) on Auburn Street (which is a dead end). Auburn Street is approximately ½ block south of 109 Grape Street. At approximately 2227 hours, Roman's Acura is recorded turning north onto Grape Street from Springfield Street and appeared to stop before reaching Elm Street, the next intersection after Auburn Street. Elm Street is approximately ½ block north of 109 Grape Street. Neither the GMC Acadia nor Roman's Acura are captured on any the surveillance recordings obtained by investigators until approximately 2251 hours. At 2251 hours, video surveillance recorded Roman's Acura turn westbound onto Springfield Street from Grape Street. At approximately 2253 hours Roman's Acura turned into the parking lot of 115 South Street. At 2303 hours, as described above, Roman's Ring camera captured an unknown person, wearing a mask, enter Roman's apartment and then turn to the Ring camera and tear it from the wall. At 2323

hours, video surveillance recorded Roman's Acura depart the parking lot at 115 South Street and turn onto South Street and then onto Nonotuck Avenue.

63.     The call detail records also show **Target Device 2** (BATISTE) was in frequent communication with **Target Device 5** (GARCIA) during the evening of December 24, 2020. More particularly **Target Device 2** and **Target Device 5** were in communication with each other on multiple occasions from approximately 1858 hours through 2112 hours. Call detail records also revealed that between 0120 hours and 0125 hours, on December 25, 2020, there were multiple outgoing communications from **Target Device 3** (ROBERSON) to **Target Device 5**.

64.

lou

65.     Unless specifically deleted, **Target Device 5** will contain evidence of communications with BATISTE and ROBERSON, and possibly Roman, such as call logs, contact information, SMS and MMS messages, and other communications made through Wi-Fi based communication Apps, such as WhatsApp or Facebook messenger.

#### Probable Cause to Search Target Premises 1 and Target Device 6

66.     On December 26, 2020, Massachusetts investigators learned from Roman's family members that there was a Snapchat video of a female allegedly wearing Roman's hat, earrings,

and a necklace he purchased. Investigators were informed that the female's Snapchat name was "Kingkoda," who goes by the name of "Dakota," and is a stripper at The Fifth Alarm. The Fifth Alarm is an adult entertainment club located in Springfield, Massachusetts. Investigators obtained a phone number for the Fifth Alarm and contacted one of the bartenders and asked if she knew of anyone by the name of "Dakota." The bartender stated she did not know "Dakota" personally and did not know her real name but told investigators that "Dakota's" Facebook account was under the name of "Prima Donna Smith."

67.     Investigators located the Facebook account in the name of "Prima Donna Smith" and observed publicly available pictures of a female that was similar in appearance to the female on the Snapchat video. This female also had a tattoo on her shoulder, as did the female in the Snapchat video. The "Prima Donna Smith" Facebook profile listed a date of birth of xx-xx-1988. The account also listed several relatives. From the information in the Facebook profile, Massachusetts investigators developed the name of Shamari R. SMITH, with the same date of birth of xx-xx-1988.

68.     Investigators searched a public records database to which law enforcement officers have access and identified telephone number (860) 281-3198 as a telephone number associated with SMITH in 2020. Thereafter, investigators served an administrative subpoena on Sprint, the service provider for telephone number (860) 281-3198. This phone is subscribed to Shamari SMITH at 19 Poplar Place, Third Floor, Waterbury, Connecticut. According to the subscriber records provided by Sprint, this address was effective as of March 23, 2020, and that the same account also lists a historical billing name of "Dakota Rodriguez." Additionally, according to Connecticut Information Sharing System (CISS), which is a comprehensive, state-wide criminal justice information technology system that provides the ability to electronically share offender

28

information within Connecticut's criminal justice community, ROBERSON also resides at 19 Poplar Place, Third Floor, Waterbury, Connecticut.

69. Investigators determined that SMITH was arrested by the Massachusetts State Police in Springfield in February of 2020. This arrest report listed SMITH's occupation as a dancer at the Fifth Alarm, and the booking photograph appeared to match the female subject in the "kingkoda" Snapchat postings. Additionally, investigators obtained a police report from the Springfield Police Department which documented an interaction with SMITH. This report indicated that SMITH went by the name "Dakota" and worked at the Fifth Alarm. Investigators reviewed additional social media accounts for SMITH and located an Instagram account that had numerous publicly visible images of SMITH and listed her Snapchat account as "kingkodahh."

70. On December 28, 2020, W-1 informed Massachusetts investigators that she and Roman went to a jewelry store in Boston on December 23, 2020 because he wanted to pick up her Christmas present. W-1 said that the gift was a necklace with a letter "F" pendant. W-1 said Roman gave her the gift on December 23, but she insisted Roman give it to her on Christmas day instead. W-1 said she had the necklace in her possession until the following day. W-1 stated she went to Roman's apartment on December 24, at approximately 5:49 p.m. to give the necklace to Roman. W-1 said she texted Roman to let him know she was outside. Roman then unlocked his car from inside his apartment and she put the necklace in his car and left.

71. W-1 showed investigators multiple Snapchat posts of a female with the Snapchat vanity name of "KingKoda" who W-1 said was wearing her necklace. W-1 stated the female in the video was also wearing Roman's earrings and hat. Observed in one video clip was a female wearing a dark colored baseball style hat with "Gucci" written on the front, a pair of distinct large, circular earrings, and a distinctly designed necklace with a large letter "F" pendant that appeared

29

to be studded with diamonds or a similar material. Also observed on the post was the date of the post "Dec. 26" with a heart emoji. In this one video clip the female appears to be zooming in and admiring her jewelry. Included below are two screenshots from this video clip which show the female's face and a closeup view of the necklace.



72.     On January 20, 2021, W-1 spoke with detectives and provided additional information and videos regarding the necklace and Roman's personal items. W-1 stated that on December 23, 2020 she drove with Roman to Boston to finish Christmas shopping. W-1 stated that Roman wanted to stop at the Mr. Exclusive jewelry store to make a payment on some jewelry he was getting custom made. W-1 stated when they arrived at Mr. Exclusive, she dropped off Roman because there was no parking on the street. W-1 stated when Roman returned to the car,

he asked her what she wanted for Christmas. Roman then gave W-1 the necklace with the "F" pendant as her Christmas gift. W-1 provided investigators with a video she took of herself holding the necklace and "F" pendant in the original box, which was time stamped 5:43 p.m. on December 23, 2020. The price tag is visible in the image and appears to read "$8490.99." This necklace appears very similar in appearance and design to the necklace that Shamari Smith can be seen wearing on her Snapchat story under the display name of "Kingkoda" on December 26, 2020.

73.     W-1 provided additional photos and text messages to support her claim that Roman had purchased and given the necklace and letter "F" pendant to her on December 23, 2020.



74.     W-1 also provided pictures of Roman wearing the same dark colored "Gucci" baseball hat with "Gucci" written on the front and the same style earrings that Smith can be seen wearing on her Snapchat story on December 26, 2020. Included below are cropped and zoomed images showing Roman's earrings and hat.

31



75.     W-1 said she called the manager at Mr. Exclusive after Roman was found dead because she knew they were still customizing a piece of jewelry for him that she wanted to pay off and keep so she could have something to remember him by. The manager informed her that he believed Roman had store credit and that was what he was using to purchase gifts.

76.     On January 20, 2021, a Massachusetts State Police investigator spoke with Aaron Youshie, who is the manager at Mr. Exclusive jewelry store in Boston. Youshie informed investigators that he remembered Roman purchasing the necklace and "F" pendant on December 23, 2020. Youshie stated that Roman had store credit which he used to pay for the necklace and the "F" pendant. Youshie stated that Roman appeared to be in a rush and was not given a receipt. Youshie stated that he provides hand-written receipts and because Roman left before Youshie could complete the receipt for the transaction, he did not have one on file to provide investigators.

77. ·

78.     A Snapchat vanity name is different from the account's username. The vanity name can be changed by the user, but the username remains the same over time and is needed to particularly identify the account. The name "kingkoda" appears to be a vanity name, and Smith's Instagram profile indicated that her Snapchat username is "kingkodahh." To corroborate Smith's Snapchat username, on or about January 22, 2021, Hartford investigators contacted W-1 and asked her if she had additional information on the "kingkoda" account. W-1 sent Hartford investigators a screenshot of the account information which included the vanity name "kingkoda" and username "kingkodahh."

79.     Snapchat users can make a "snap," which is a picture or video message taken and shared with other Snapchat users in real-time. The sender of a snap has the option of setting a timer for how long a snap can be viewed. Once a snap has been viewed, it is no longer visible to the recipient. Snapchat users can send text messages to others using the Chat feature. Once a user leaves the Chat screen, messages viewed by both the sender and the receiver will no longer be visible. The application notifies other users when they are online so that can begin messaging each other. In addition, Snapchat users can send pictures to other users by utilizing the camera on their device. Pictures can also be sent from the saved pictures in the photo gallery of the device.

80.     "Our Stories" is a collection of user submitted "Snaps" from different locations and events. A Snapchat user from different locations and events. A Snapchat user, with the location services of their device turned on, can contribute to a collection of snaps regarding the event. For example, multiple different Snapchat users at an event could all contribute to the same "Our Stories" collection by sharing their snaps, even if they do not know each other. Users can also view "Our Stories" events if they are not actually present at the event by subscribing to the story. In addition to "Our Stories," a Snapchat user can keep a sort of photo/video diary using the "Story" feature. Each snap in a "Story" documents the user's experience. Based on the user's privacy settings, the photos and videos added to a "Story" can be viewed either by everyone on Snapchat or just the user's friend. Stories are visible to other users for up to 24 hours.

81.     While a Snapchat message may disappear, the record of who sent it and when it was sent still exists. Snapchat records and retains information that is roughly analogous to the call detail records maintained by telecommunications companies. This includes the date, time, sender, and recipient of a snap. Additionally, the user can save the Snapchat video or photograph in the Memories section of the application on the user's cellular device.

82.

34

86.

REDACTED

87.

88.

89.

90.

REDACTED

91.

92.

REDACTED

93.    Below is ROBERSON's Facebook picture identified          _ and a still photograph obtained from the Mobil Mart video which depicted the GMC Acadia front seat passenger on December 25, 2020.

 

94.

95.    Additionally, after Roman was reported missing, Massachusetts investigators located at Roman's apartment an empty box for a Sony PlayStation 5. The empty box identified the console's serial number as AJ36550097. Sony launched its highly anticipated PlayStation 5 in November 2020 and according to various media outlets Sony exceeded all time sale records for a gaming console, making it a highly coveted and difficult item to acquire. Investigators requested by subpoena subscriber information, login activity, and email address screen name for this console.

On February 3, 2021, Sony produced records in response to the subpoena. Sony reported that the console was accessed by an online identification of "ghost203413" with the sign-in identification calrob1988@gmail.com., with an address in Waterbury, Connecticut. According to Sony, the initial login from that account was December 26, 2020 at approximately 06:30 a.m., utilizing an IP address owned by Comcast in Connecticut.

96.     Based on the foregoing, there is probable cause to believe, and I do believe, that there is evidence of the Target Offenses located in **Target Premises 1** to include clothing, property, and jewelry owned or possessed by Roman on the night he was kidnapped and murdered, as well as **Target Devices 3, 4** and **6**. There is also probable cause to believe that the clothing and jewelry seen on the surveillance video from Mobil Mart on December 25, 2020 will be in **Target Premises 1**. I know from my training and experience that clothing and personal effects are typically kept in a person's primary residence and persons will keep their clothing for long periods of time including when they move from residence to residence.

**Probable Cause to Search Target Premises 2 and 3**

97.     As noted above, historical cell tower and video surveillance has revealed that BATISTE has traveled to a storage location in South Hadley, MA, at times relevant to this investigation. For the reasons set forth herein, there is probable cause to believe, and I do believe, that fruits, instrumentalities, and evidence of the Target Offenses are located in one or both of storage units to which BATISTE has access.

98.     On January 11, 2021, at approximately 11:45 a.m., Massachusetts investigators traveled to Community Self-Storage located at 22 Industrial Drive, South Hadley. Investigators learned that units A27 (**Target Premises 2**) and A28 (**Target Premises 3**) were rented by Patrick

Oliver. According to Massachusetts CJIS records, Patrick Oliver also uses the name Patrick Batiste and is believed to be Brandon BATISTE's father.

99.     Investigators obtained video surveillance recordings from Community Self-Storage, as well gate access logs and access codes assigned to Oliver. From these records and video recordings, investigators identified multiple times that the storage facility had been accessed using Oliver's code with vehicles associated with Brandon BATISTE.

100.    For example, on the date of Roman's abduction, on December 24, 2020, at approximately 1530 hours, a GMC Acadia, bearing Maryland marker plate 2DW7033 (the vehicle rented by BATISTE on December 4, 2020 from Enterprise), traveled eastbound on Industrial Avenue before it pulled up to the front gate of the storage facility. The operator reached out of the vehicle window with his left hand out and entered a code into the code pad before the gate opened. The operator drove the vehicle forward and toward the west side of the facility (in the direction of storage units A27 and A28). At approximately 1548 hours, the GMC Acadia returned to the gate from the same direction. The operator reached out of the driver's side window and entered a code into the code pad. From the security recording, the operator appears to be a black male wearing a black and grey camo long sleeve shirt. The gate opened, and the vehicle pulled forward and drove onto Industrial Drive. Historical location records obtained for **Target Device 1** indicated that it was in the area of Community Self Storage on December 24, 2020, at around 1529 hours.

101.    At approximately 0738 hours on December 25, 2020, video surveillance camera recorded the GMC Acadia arrive and park at 109 Mildred Avenue, Springfield, the residence of Chazalyn Santa-Colon, a known female associate of BATISTE. There is also a front seat passenger, who appears to be female. The operator exited the GMC and is wearing a black/grey

41

camo long-sleeve hooded shirt or sweatshirt and a black/grey camo pants. The shirt or sweatshirt has what appeared to be a white Puma logo.

102.　At approximately 1327 hours, on December 26, 2020, a green Dodge Charger, bearing Ohio marker plate HVS4782 (the vehicle obtained by BATISTE from Enterprise on December 26, 2020 in exchange for the GMC Acadia) pulled up to the front gate of the storage facility from Industrial Drive. The operator reached out of the window with his left hand and entered a code into the code pad before the gate opened. The operator pulled the vehicle forward and drove toward the west side of the facility (in the direction of **Target Premises 2** and **3**). From video surveillance, investigators observed a black male, wearing a black hat with a light-colored logo, sitting the driver seat. It did not appear that anyone else was in the vehicle. At approximately 1343 hours, the Dodge Charger vehicle exited the facility without entering a gate code as the gate was already open, turned right and traveled westbound on Industrial Ave.

103.

hours, the Dodge Charger arrived at the storage facility where **Target Premises 2** and **3** are located.

104. At approximately 1431 hours, security video from the area of 15 Beacon Circle, Springfield (residence of Nydia Miranda, a known female associate of BATISTE) captured the green Dodge Charger arrive and park. At approximately 1439 hours, the same security video captured a white Honda Accord coupe arrive and park in the space next to the green Dodge Charger directly in front of 15 Beacon Circle. At approximately 1849 hours, a person went to the white Honda Accord and opened the trunk, and then walked to the green Dodge Charger and opened that trunk and remove something. The person then went to the open trunk of the white Honda Accord coupe and appeared to place the item into the Honda trunk. Investigators confirmed that Nydia Miranda, a known female associate of BATISTE, owns a 2013 white Honda Accord coupe and resides at 15 Beacon Circle. The person then walked towards the direction of 15 Beacon Circle before returning to the white Honda Accord. The person then departed in the white Honda.

105.

106. BATISTE also appeared to have accessed **Target Premises 2** and/or **3** on January 1, 2021. At approximately 1455 hours, a white Honda Accord bearing Massachusetts marker plate

2MR224 pulled up to the main gate to exit the facility. This vehicle is registered to Chazalyn Santa-Colon, 109 Mildred Avenue, Springfield, and is a known female associate of BATISTE. The vehicle came from the west side of the facility. The operator opened the driver door and leaned out to enter a code into the code pad. The operator was a black male wearing a black coat. The gate opened and the vehicle pulled forward and turned right onto Industrial Drive westbound.

107.

108.

## TECHNICAL TERMS FOR SEARCH OF TARGET DEVICES

109.    As it pertains to the requested search warrants for the **Target Devices**, that based on my training and experience, I use the following technical terms to convey the following

meanings:

    a.  Wireless telephone: A wireless telephone is a handheld wireless device used primarily for voice communication through radio signals. These telephones send signals through networks of transmitter/receivers called "cells," enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones now offer a broad range of capabilities. These capabilities include, but are not limited to: storing names and phone numbers in electronic "address books;" sending, receiving, and storing electronic communications such as text messages and email; taking, sending, receiving, and storing photographs and video; storing and playing audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

    b.  Digital camera: A digital camera is a device that records still and moving images digitally. Digital cameras use a variety of fixed and removable media to store recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

    c.  GPS: A GPS navigation device uses the Global Positioning System ("GPS") to display its current location. It often contains records of the locations where it has been and addresses and directions to locations programmed by the user. The Global Positioning System consists of 24 NAVSTAR satellites orbiting Earth. Each satellite contains a precise clock and repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculates the antenna's latitude, longitude, and sometimes altitude, with a high level of precision.

    d.  IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control

a range of IP addresses. Some computers have static-that is, long-term-IP addresses, while other computers have dynamic-that is, frequently changed-IP addresses.

c. Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

110.    Based on my training, experience, I know that the **Target Devices** have different capabilities that allow them to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and PDA. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device, as well as evidence relating to co-conspirators with whom the **Target Devices** were in communication.

111.    With regard to the **Target Devices**, I request permission to enter and search the devices for evidence relating to the Target Offenses, including evidence of communications between and among BATISTE, ROBERSON, GARCIA, and SMITH, and/or other co-conspirators, involved in the kidnapping and murder of Francisco Roman, Jr., and the destruction of Roman's vehicle. Based on my training and experience, and as set forth in this affidavit, I believe that BATISTE and ROBERSON used wireless telephones to communicate with each other to coordinate Roman's abduction and the transportation of Roman from Chicopee, Massachusetts to Hartford, Connecticut. Furthermore, based on my training and experience, I know that internet browsing history in wireless phones can contain evidence of internet searches for locations and addresses of businesses associated with criminal activity such as locations used to conceal or secure evidence, as well as renting or leasing vehicles used by co-conspirators to commit the Target Offenses. Internet browsing history could also identify the user of the **Target Devices** based on

the website and locations they access. Also based on my training and experience, wireless phones may contain videos and images of coconspirators, their possession of evidence associated with the Target Offenses, such as Roman's jewelry and clothing, and weapons and tools used to commit the Target Offenses, locations visited by the perpetrators before, during, and after the crimes committed, and clothing worn by the perpetrators. I also know that such images or videos might be stamped with a date and time, as well geolocation data, that would assist investigators in establishing a timeline and locations relevant to the Target Offenses. I also know based on my experience and training that some wireless phones are equipped with GPS data, which would also show locations relevant to the abduction and murder of Roman, as well as the destruction of Roman's vehicle.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS OF TARGET DEVICES

112.    Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

113.    *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the **Target Devices** were used, the purpose of their use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on the **Target Devices** because:

> a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

47

b. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

114. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrants I am applying for would permit the examination of the **Target Devices** consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many

parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

115.   It is also requested that the warrant be deemed executed once the **Target Devices** have been seized in the manner described above, and that further analysis of the images be permitted at any time thereafter, with the following limitation.

## INFORMATION RELEVANT TO THE REQUEST FOR PRECISION LOCATION DATA AND OTHER INFORMATION FROM THE TARGET DEVICES

### Cell Site Data

116.   Based on my training and experience, I know that the Service Provider can collect cell-site data on a prospective basis about the **Target Devices**. Based on my training and experience, I know that for each communication a cellular device makes, its wireless service provider can typically determine: (1) the date and time of the communication; (2) the telephone numbers involved, if any; (3) the cell tower to which the customer connected at the beginning of the communication; (4) the cell tower to which the customer was connected at the end of the communication; and (5) the duration of the communication. I also know that wireless providers such as the Service Provider typically collect and retain cell-site data pertaining to cellular devices to which they provide service in their normal course of business in order to use this information for various business-related purposes.

### E-911 Phase II / GPS Location Data

117.   I know that some providers of cellular telephone service have technical capabilities that allow them to collect and generate E-911 Phase II data, also known as GPS data or latitude-longitude data. E-911 Phase II data provides relatively precise location information about the cellular telephone itself, either via GPS tracking technology built into the phone or by triangulating

on the device's signal using data from several of the provider's cell towers. As discussed above, cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone connected. These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device. Accordingly, cell-site data is typically less precise that E-911 Phase II data.

118.    Based on my training and experience, I know that the Service Provider can collect E-911 Phase II data about the location of the **Target Devices**, including by initiating a signal to determine the location of the **Target Devices** on the Service Provider's network or with such other reference points as may be reasonably available.

119.    Location information can be in the form of historical records. For Verizon, this would include any reports of device activity that would include the approximate latitude and longitude of the device at the time of the activity, direction and distance from the tower, and other location related information commonly referred to as an RTT (Round Trip Timing), EVDO, ALULTE, and Levdort report. This further includes any other report similar in nature.

120.    For AT&T, this would include any reports of device activity that would include the approximate latitude and longitude of the device at the time of the activity, direction and distance from the tower, and other location related information commonly referred to as a NELOS report. This further includes any other report similar in nature.

121.    For T-Mobile, this would include any reports of device activity that would include the approximate latitude and longitude of the device at the time of the activity, direction and

distance from the tower, and other location related information commonly referred to as TDOA, Timing Advance, or TrueCall Information. This further includes any other report similar in nature.

122.    As to Sprint, this would include any reports of device activity that would include the approximate latitude and longitude of the device at the time of the activity, direction and distance from the tower, and other location related information commonly referred to as a PCMD (Per Call Measurement Detail) report. This further includes any other report similar in nature.

### Pen-Trap Data

123.    Based on my training and experience, I know each cellular device has one or more unique identifiers embedded inside it. Depending on the cellular network and the device, the embedded unique identifiers for a cellular device could take several different forms, including an Electronic Serial Number (ESN), a Mobile Electronic Identity Number (MEIN), a Mobile Identification Number (MIN), a Subscriber Identity Module (SIM), a Mobile Subscriber Integrated Services Digital Network Number (MSISDN), an International Mobile Subscriber Identifier (IMSI), or an International Mobile Equipment Identity (IMEI). The unique identifiers – as transmitted from a cellular device to a cellular antenna or tower – can be recorded by pen-trap devices and indicate the identity of the cellular device making the communication without revealing the communication's content.

### Authorization Request for Target Devices – Precision Location Information

124.    Based on the foregoing, I request that the Court issue the proposed search warrants, pursuant to §§ 2703(a), 2703(b)(1)(A), 2703(c)(1)(A) and Federal Rule of Criminal Procedure 41 as, based on the facts set forth above, I believe that the location of the **Target Devices** will lead to evidence of the Target Offenses by identifying their locations so that the search warrants for the **Target Devices** may be timely executed. I also request that the Court authorize the use of a pen

register and trap and trace device as the information sought is material and relevant to an on-going investigation into the Target Offenses.

125.     I further request that the Court direct the Service Provider to disclose to the government any information described in Section I of Attachment B that is within its possession, custody, or control.

126.     I also request that the Court direct the Service Provider to furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the information described in Attachment B unobtrusively and with a minimum of interference with the Service Provider's services, including by initiating a signal to determine the location of the **Target Devices** on the Service Provider's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The FBI shall reasonably compensate the Service Provider for reasonable expenses incurred in furnishing such facilities or assistance.

## CELL-SITE SIMULATOR – MANNER OF EXECUTION

127.     In my training and experience, I have learned that cellular phones and other cellular devices communicate wirelessly across a network of cellular infrastructure, including towers that route and connect individual communications. When sending or receiving a communication, a cellular device broadcasts certain signals to the cellular tower that is routing its communication. These signals include a cellular device's unique identifiers.

128.     To facilitate execution of this warrant, law enforcement may use an investigative device or devices capable of broadcasting signals that will be received by the **Target Devices** or receiving signals from nearby cellular devices, including the **Target Devices**. Such a device may function in some respects like a cellular tower, except that it will not be connected to the cellular

network and cannot be used by a cell phone to communicate with others. The device may send a signal to the **Target Devices** and thereby prompt it to send signals that include the unique identifier of the device. Law enforcement may monitor the signals broadcast by the **Target Devices** and use that information to determine the **Target Devices'** location, even if it is located inside a house, apartment, or other building.

129. The investigative device may interrupt cellular service of phones or other cellular devices within its immediate vicinity. Any service disruption to non-target devices will be brief and temporary, and all operations will attempt to limit the interference with such devices. In order to connect with the **Target Devices**, the device may briefly exchange signals with all phones or other cellular devices in its vicinity. These signals may include cell phone identifiers. The device will not complete a connection with cellular devices determined not to be the **Target Devices**, and law enforcement will limit collection of information from devices other than the **Target Devices**. To the extent that any information from a cellular device other than the **Target Devices** is collected by the law enforcement device, law enforcement will delete that information, and law enforcement will make no investigative use of it absent further order of the court, other than distinguishing the Target Cellular Device from all other cellular devices.

### Authorization Request – Cell-Site Simulator

130. Based on the foregoing, I request that the Court issue the proposed search warrants, pursuant to Federal Rule of Criminal Procedure 41. The proposed warrant also will function as a pen register order under 18 U.S.C. § 3123.

131. I further request, pursuant to 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), that the Court authorize the officer executing the Target Device Precision Location Search Warrants and the Target Device Cell-Site Simulator Search Warrants to delay

notice until 30 days "after the collection authorized by the warrant has been completed. There is reasonable cause to believe that providing immediate notification of the warrant may have an adverse result, as defined in 18 U.S.C. § 2705. Providing immediate notice to the subscriber or user of the **Target Devices** would seriously jeopardize the ongoing investigation, as such a disclosure would give that person an opportunity to destroy evidence, change patterns of behavior, notify confederates, and flee from prosecution. *See* 18 U.S.C. § 3103a(b)(1). As further specified in Attachment B, which is incorporated into the warrant, the proposed search warrant does not authorize the seizure of any tangible property. *See* 18 U.S.C. § 3103a(b)(2). Moreover, to the extent that the warrant authorizes the seizure of any wire or electronic communication (as defined in 18 U.S.C. § 2510) or any stored wire or electronic information, there is reasonable necessity for the seizure for the reasons set forth above. *See* 18 U.S.C. § 3103a(b)(2).

132.    Because the Target Device Precision Location Search Warrants will be served on the Service Provider, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night. I further request that the Court authorize execution of the Target Device Precision Location Search Warrants at any time of day or night, owing to the potential need to locate the **Target Devices** outside of daytime hours.

133.    I further request that the Court authorize execution of the Target Device Cell-Site Simulator Search Warrants at any time of day or night, owing to the potential need to locate the **Target Devices** outside of daytime hours.

134.    I further request that the Court order that all papers in support of this application, including the affidavit and search warrant, be sealed until further order of the Court. These documents discuss an ongoing criminal investigation that is neither public nor known to all the

targets of the investigation. Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize that investigation, including by giving targets an opportunity to destroy or tamper with evidence, change patterns of behavior, notify confederates, and flee from prosecution.

_Ou 10.7MA_  2|4|21
_____
Dennis DeMatteo,
Task Force Officer, FBI

The truth of the foregoing affidavit has been attested to me by FBI Task Force Officer Dennis DeMatteo over the telephone on February **5**, 2021.

XXXXXXXXXXXXX Date: 2021.02.05
/S/ TOF          12:44:10 -05'00'
_____
THOMAS O. FARRISH
UNITED STATES MAGISTRATE JUDGE